

**SIGNED this 10th day of September, 2021**

_Shelley D. Rucker_
Shelley D. Rucker
CHIEF UNITED STATES BANKRUPTCY JUDGE

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF TENNESSEE

In re:

**Michael Allen Mixson,**

     **Debtor.**

_____

**First Volunteer Bank,**

     **Plaintiff,**

**v.**

**FMM Bushnell, LLC,**

     **Defendant.**

**No. 1:20-bk-12728-SDR**

**Chapter 11**

**Adv. No. 1:20-ap-01051-SDR**

## <u>MEMORANDUM OPINION</u>

### I.   INTRODUCTION

     This proceeding involves the priority of the liens of two banks.  In 1998, debtor Michael Mixson and his then-wife Rebecca borrowed money from Union Planters Bank, N.A. ("Union Planters") through a note secured by a Deed of Trust (the "1998 Deed of Trust") on property that they owned.  A 2003 modification to the 1998 Deed of Trust set a loan maturity date of March 7,

2008.  After some assignments and mergers over the years, the 1998 note and Deed of Trust are held now by defendant FMM Bushnell, LLC ("Bushnell").  In 2013, the Mixsons borrowed money from plaintiff First Volunteer Bank ("First Volunteer") through a note secured by a Deed of Trust (the "2013 Deed of Trust") on the same property.

This case—*In re Mixson*, No. 20-bk-12728-SDR (the "Main Case")—is Mr. Mixson's second bankruptcy case in the last seven years, and the priority of the two Deeds of Trust was not resolved in the prior case.  In short, Bushnell contends that its 1998 Deed of Trust has priority because it was filed first and because its lien is still enforceable.  As will be explained in more detail below, Bushnell had 10 years to enforce its Deed of Trust, but it believes that the automatic stays from Mr. Mixson's two bankruptcies left it with unused time in that 10-year time period.

First Volunteer, in contrast, contends that its 2013 Deed of Trust has priority because the bankruptcy stays did not prevent Bushnell's enforcement time from running.  According to First Volunteer, if the time to enforce the 1998 Deed of Trust has expired then Bushnell has become a general unsecured creditor, and First Volunteer moves up in priority.

To resolve the dispute, First Volunteer filed this adversary proceeding.  Now pending before the Court are cross-motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, made applicable by Rule 7056 of the Federal Rules of Bankruptcy Procedure. (Doc. Nos. 15, 17.)  The parties also have filed related procedural motions concerning First Volunteer's late answer to Bushnell's counterclaim.  (Doc. Nos. 23, 25.)  The parties do not dispute that this adversary proceeding is a core proceeding and that the Court has jurisdiction under 28 U.S.C. 157(a) and 28 U.S.C. § 1334.

2

The Court heard oral argument on May 5, 2021. For the reasons below, the Court grants First Volunteer's motion for summary judgment and denies Bushnell's motion. The Court grants First Volunteer a declaratory judgment that the lien evidenced by the 1998 Deed of Trust is discharged. The Court also denies Bushnell's procedural motion and grants First Volunteer's procedural motion.

## II.    BACKGROUND

### A. *Chronology*

This adversary proceeding concerns the priority of liens on real property at 6228 Airpark Drive in Chattanooga, Tennessee (the "Airpark Property"). The following chronology summarizes the key events that contributed to the current situation between the parties:

1)    January 6, 1990: Debtor Michael Mixson and Rebecca Mixson (who is not a joint debtor) marry. (Doc. No. 16-7 at 4.)[1]

2)    February 3, 1995: The Mixsons buy the Airpark Property as tenants by the entirety. (Doc. No. 16 at 1.)

3)    February 26, 1998: The Mixsons record the 1998 Deed of Trust with Union Planters to secure a loan in the amount of $583,425.76. (Doc. No. 1-1 at 1–18.) The 1998 Deed of Trust pledges the Airpark Property. The loan had a final payment date of February 20, 2018.

4)    March 7, 2003: The Mixsons and Union Planters sign a modification of the 1998 Deed of Trust that increases the amount of loan principal secured to $684,000.00 and shortens the maturity date to March 7, 2008. (*Id.* at 19.)

5)    Sometime after March 7, 2003: AmSouth Bank succeeds Union Planters as holder of the 1998 Deed of Trust and its underlying note. Regions Bank succeeds AmSouth Bank.

6)    April 27, 2011: The Mixsons sign a Deed of Trust with Gateway Bank and Trust ("Gateway") to secure a loan in the amount of $463,207.67. (Doc. No. 1-3 at 8.) They record the Deed of Trust on May 31, 2011 and pledge the Airpark Property as security for the Gateway loan. The loan had a maturity date of November 10, 2014.

7)    September 2012: Gateway merges into First Volunteer. (Doc. No. 1 at 5.) First Volunteer

---

[1] All document citations refer to the docket in this adversary proceeding unless otherwise noted.

acquires all of Gateway's assets including the Mixsons' loans and Deeds of Trust.

8)      July 29, 2013: The Mixsons sign the 2013 Deed of Trust with First Volunteer to secure a
loan in the amount of $633,363.41. (Doc. No. 1-4.) This loan appears to be a consolidation
or replacement of the Gateway loan, because the 2011 Gateway Deed of Trust and the 2013
Deed of Trust are security instruments for the same debt. (Doc. No. 15 at 9.) The Mixsons
pledge the Airpark Property as collateral. The new loan had a maturity date of February 2,
2015. (*Id.* at 8.) The 2013 Deed of Trust was recorded on August 1, 2013.

9)      December 20, 2013: Regions Bank assigns the 1998 Deed of Trust and underlying note to
Commercial Funding Solutions, LLC ("Commercial Funding"). (Doc. No. 1-5.)

10)     May 19, 2014: Mr. Mixson files his first Chapter 11 voluntary petition, presided over by
Judge Cook and later Judge Whittenburg in this District. (Case No. 1:14-bk-12133-NWW,
the "First Mixson Case").

11)     August 12, 2014: First Volunteer files Claim 11 in the First Mixson Case, asserting a
cumulative indebtedness by Mr. Mixson of $657,347.29 secured by the Airpark Property
by way of the 2013 Deed of Trust.

12)     September 18, 2014: Commercial Funding files Claim 14 in the First Mixson Case,
asserting a cumulative indebtedness by Mr. Mixson of $560,679.18 secured by the Airpark
Property by way of the 1998 Deed of Trust.

13)     June 1, 2017: Judge Whittenburg grants Mr. Mixson's motion to convert the First Mixson
Case from Chapter 11 to Chapter 7. (First Mixson Case, Doc. No. 261.)

14)     July 30, 2017: Commercial Funding assigns the 1998 Deed of Trust to Bushnell. (Doc.
No. 1-6.)

15)     September 15, 2017: Mr. Mixson signs a reaffirmation agreement with Bushnell in the First
Mixson Case for the 1998 debt originally incurred with Union Planters and modified in
2003. (First Mixson Case, Doc. No. 279.) The principal balance is $508,316.84, with a
total of $579,300.98 to be paid over the term of the reaffirmation agreement. The parties
to the reaffirmation agreement assert that the debt is secured by the Airpark Property and
assign the property a market value of $650,000.00. First Volunteer admits that the 1998
Deed of Trust was valid when the debt was reaffirmed. (Doc. No. 21 at 2.)

16)     October 4, 2017: Mr. Mixson receives an order of discharge in the First Mixson Case.
(First Mixson Case, Doc. No. 281.)

17)     November 12, 2019: Judge Whittenburg approves the Trustee's abandonment of the
Airpark Property in the First Mixson Case. (First Mixson Case, Doc. No. 294.)

18)     August 4, 2020:    The Mixsons obtain a final decree of divorce. (Doc. No. 16-7 at 1–2.)
Under the terms of the divorce, Mr. Mixson received all rights, title, and debt

4

responsibilities for the Airpark Property. (*Id.* at 7.) The parties had mutual obligations to fulfil to make Mr. Mixson the full owner of the Airpark Property. Mr. Mixson was required to refinance the Airpark Property as needed to release Ms. Mixson from any debts associated with it. (*Id.*) Ms. Mixson, in turn, was required to execute a quitclaim deed of her interest in the Airpark Property. (*Id.*) The record is silent as to whether the Mixsons carried out their respective obligations, and the parties appear to dispute whether the obligations have been fulfilled.

19)   October 2, 2020: Relying on the terms of the 1998 Deed of Trust, Bushnell took its first action toward foreclosure by publishing a foreclosure notice relating to the Airpark Property in the *Hamilton County Herald*. The sale was scheduled for October 23, 2020.

20)   October 16, 2020: Mr. Mixson files his second Chapter 11 voluntary petition, which is the Main Case before the Court.

21)   January 6, 2021: Bushnell files Claim 13 in the Main Case here, asserting a cumulative indebtedness by Mr. Mixson of $746,133.00 secured by the Airpark Property by way of the 1998 Deed of Trust.

22)   February 16, 2021: First Volunteer files Claim 15 in the Main Case here, asserting a cumulative indebtedness by Mr. Mixson of $767,125.15 secured by the Airpark Property. Attached to Claim 15 is a copy of the note signed on April 27, 2011 along with the Deed of Trust signed on April 27, 2011 and recorded on May 31, 2011.

### B.  The Parties' Contentions

First Volunteer commenced this adversary proceeding by filing its complaint on October 21, 2020. (Doc. No. 1.) First Volunteer recited most of the history that the Court summarized above, emphasizing that no one in the chain of ownership of the 1998 Deed of Trust—Union Planters, Regions Bank, Commercial Funding, or Bushnell—modified, enforced, or otherwise commenced any suit to enforce the lien granted by the Deed of Trust after March 7, 2003. The lack of action is significant to First Volunteer because, in its view, the 1998 Deed of Trust expired with respect to Ms. Mixson no later than March 7, 2018—the date when the right to enforce the lien under Tenn. Code Ann. § 28-2-111(a) expired. (*See* Doc. No. 1 at 6.) By a similar logic, the 1998 Deed of Trust allegedly expired with respect to Mr. Mixson no later than 30 days after the abandonment of the Airpark Property on November 12, 2019, by way of 11 U.S.C. § 108(c)(2)

and/or 90 days by way of Tenn. Code Ann. § 66-21-110. (*See id.*) "Because the [1998 Deed of Trust] no longer is valid and enforceable, the Gateway DOT and/or the First Volunteer DOT is a first lien on the Airpark Property such that First Volunteer, as the holder of the Gateway DOT and the First Volunteer DOT, is the only lien holder with rights in the Airpark Property. First Volunteer holds a first priority lien on the Airpark Property." (*Id.* at 8.) First Volunteer ended the complaint with a request for declaratory judgment that the 1998 Deed of Trust has been discharged; that Bushnell's debt is no longer secured by the Airpark Property; and that, as of the filing date of the Main Case, First Volunteer is the first lien holder with respect to the Airpark Property. (*Id.*)

Bushnell filed its answer and counterclaim on November 23, 2020. (Doc. No. 6.) The core of Bushnell's answer, affirmative defenses, and counterclaim involves the impact of the automatic stays imposed by Mr. Mixson's bankruptcy filings on the length of time it had to enforce its lien. Bushnell contends as follows:

Bushnell was enjoined from foreclosing on the Union Planters Note secured by the Union Planters DOT from May 19, 2014 (the date Mr. Mixson filed the [First Mixson Case]) until either the entry of the Mixson Reaffirmation on September 15, 2017, or the date of his discharge on October 4, 2017, or, as First Volunteer contends, his Trustee's abandonment of his interest in the Airpark Property on November 12, 2019, a total of at least three years, four months, and twenty-five days.

Because 11 U.S.C. § 362 enjoined Bushnell from taking any action to enforce its lien on real property securing the Union Planters DOT, as modified, the duration the injunction is added to any statute of limitation regarding enforcement of the Union Planters DOT, as modified, pursuant to Tenn. Code Ann. § 28-1-109.

Further, as Mr. Mixson has filed a second bankruptcy, the automatic stay set forth in 11 U.S.C. § 362 still enjoins Bushnell from enforcing its lien, and the additional time under which it is enjoined is added to the statute of limitations set forth in Tenn. Code Ann. § 28-2-111, pursuant to Tenn. Code Ann. § 28-1-109.

\* \* \* \*

6

Bushnell seeks a judicial determination and Order that the statute of limitation for enforcing a lien on real property as set in Tenn. Code Ann. § 28-2-111 did not begin to run until September 15, 2017, at the earliest, by virtue of the continuing operation of the 11 U.S.C § 362 Automatic Stay as to Bushnell.

Alternatively, that this Court judicially determine and Order that the 10-year statute of limitation for enforcing a lien on real property as set in Tenn. Code Ann. § 28-2-111 has been extended pursuant to Tenn. Code Ann. § 28-1-109.

(*Id.* at 13–14.)

### C. Parties' Arguments

First Volunteer filed its motion for summary judgment on April 5, 2021. First Volunteer concisely describes the central issue between the parties by noting that "First Volunteer and Bushnell agree that the Union Planters DOT was set to expire on March 7, 2018. They disagree about the effect, if any, that the stay imposed by 11 U.S.C. § 362(a)(4) when Mr. Mixson filed [his first] bankruptcy on May 19, 2014, had on the March 7, 2018 expiration date of the Union Planters DOT and on its [sic] with respect to debtor Michael Mixson's and his (non-debtor) then wife's entireties interests in the Airpark Property." (Doc. No. 15 at 2.) First Volunteer then argues for summary judgment in the following steps. Without any extensions beyond March 7, 2008, the 1998 Deed of Trust expired on March 7, 2018 under Tenn. Code Ann. § 28-2-111(a). (*Id.* at 12.) During the First Mixson Case, according to First Volunteer, two legally important events happened. Mr. Mixson's interest in the Airpark Property became part of the bankruptcy estate, and the automatic stay prevented Bushnell from foreclosing on it. The order of discharge on October 4, 2017 ended the automatic stay as to Mr. Mixson personally, but the property was still protected by the stay against actions to recover property of the estate. Bushnell was not free to foreclose on Mr. Mixson's interest until the trustee abandoned the Airpark Property on November 12, 2019, and thereby removed it from the estate. (*Id.* at 13.)

7

Meanwhile, Ms. Mixson never was a joint debtor in either of Mr. Mixson's bankruptcy cases, meaning that no automatic stay ever prevented Bushnell from foreclosing on her interest in the Airpark Property. Assuming that Bushnell's lien expired, Ms. Mixson's interest was subject only to First Volunteer's lien.

The grace period provided in 11 U.S.C. § 108(c) would not help Bushnell because the provision only applies to bringing civil actions, not to commencing a nonjudicial foreclosure (*id.* at 16) and because Bushnell did not foreclose within the grace period (*id.* at 16, 20).

Finally, Bushnell cannot avail itself of Tenn. Code Ann. § 28-1-109 because it does not apply to foreclosures against real property (*id.* at 20) and because it would be superseded by Tenn. Code Ann. § 66-21-110, which would have given Bushnell only an additional 90 days after the lifting of the automatic stay. (*Id.* at 32.)

Bushnell filed its cross-motion for summary judgment also on April 5, 2021. Bushnell recites the facts that the Court summarized above and agrees that, under Tenn. Code Ann. § 28-2-111(a), the 1998 Deed of Trust "had to be enforced on or before March 7, 2018, which was 10 years after the [2008] maturity date. That is the operative date unless the statute of limitations was suspended or otherwise tolled, which it was here." (Doc. No. 18 at 9.) Bushnell then notes that the First Mixson Case was filed on May 19, 2014, which stopped the 10-year clock to enforce the 1998 Deed of Trust because "Tennessee law treats the automatic stay as an injunction." (*Id.* (citing *McCullough v. Vaughn*, 538 S.W.3d 501 (Tenn. Ct. App. 2017)).) Under Tenn. Code Ann. § 28-1-109, "the time of the continuance of the injunction is not to be counted." According to Bushnell, the 10-year clock would have restarted when the stay terminated. Bushnell argues that the date was September 15, 2017 at the earliest, when Mr. Mixson entered his reaffirmation agreement in

the First Mixson Case, or on October 4, 2017, when he received his discharge.  The clock would have stopped again on October 16, 2020, with the filing of the Main Case and the imposition of the automatic stay.  Because the 10-year period in which to enforce the 1998 Deed of Trust has not yet elapsed, Bushnell still has time—and, therefore, first priority—to enforce its lien after the automatic stay in this case ends.

Bushnell rejects First Volunteer's arguments that the time to enforce the 1998 Deed of Trust has expired.  Bushnell argues that Tenn. Code Ann. § 66-21-110 does not apply here because the First Mixson Case never was discharged or dismissed, and the automatic stay never lifted, in the way that the statute contemplates.  Bushnell argues further that First Volunteer has misapplied 11 U.S.C. § 108(c) because it presumes that the 10-year period to enforce the 1998 Deed of Trust has expired, when it has not.  Additionally, Bushnell asserts that, despite the mutual obligations of the Mixsons in their final divorce decree, "no one has recorded any conveyance of Ms. Mixson's interest in the Airpark Property."  (*Id.* at 16.)  The absence of any conveyance is important to Bushnell because, in its view, "Tennessee law recognizes that when two spouses own property as tenants by the entirety, and only one files a chapter 7 bankruptcy, and the tenancy by the entirety interest of that spouse is included in the bankruptcy, creditors of the other spouse are precluded from taking any action that would affect any interest in the property."  (*Id.*)  Contrary to First Volunteer's position, therefore, Bushnell could not have proceeded—and still cannot proceed—against the interest in the Airpark Property that Ms. Mixson officially still possesses.

Apart from its substantive arguments, Bushnell raised a procedural argument about default. Bushnell's answer on November 23, 2020 included a counterclaim for a declaratory judgment that its lien had first priority.  First Volunteer did not answer the counterclaim until April 6, 2021, after

9

Bushnell pointed out the deficiency in its motion for summary judgment. First Volunteer's late answer prompted two procedural cross-motions that also are pending. Bushnell filed a motion to strike the answer to the counterclaim as untimely and to deem the assertions in the counterclaim as admitted. (Doc. No. 23.) First Volunteer, in turn, filed a motion to excuse its default and to accept its late answer on the grounds that it has a meritorious defense and that Bushnell has suffered no prejudice. (Doc. No. 25.)

## III.   DISCUSSION

### D.  Motions to Strike Answer and to Avoid Default

The Court will begin by addressing Bushnell's motion to strike First Volunteer's answer to the counterclaim; and First Volunteer's motion to preclude entry of default. Whether the late answer can be excused potentially affects what the Court has to consider; when a party "moves to strike an answer as untimely, the motion is treated as a motion for entry of default against the [non-moving party]." *McKeny v. Middleton*, No. 2:14-CV-2659, 2015 WL 1565658, at *1 (S.D. Ohio Apr. 8, 2015), *report and recommendation adopted*, No. 2:14-CV-2659, 2015 WL 2169311 (S.D. Ohio May 8, 2015) (citing *Amari v. Spillan*, No. 2:08-CV-829, 2009 WL 5216042, at *3 (S.D. Ohio Dec. 29, 2009) (citations omitted)); *see also United Coin Meter Co. v. Seaboard Coastline RR.*, 705 F.2d 839, 844 (6th Cir. 1983) ("[A]n answer or other opposition to a motion for default may be treated as a motion to set aside entry of default.") (citations omitted).

"There is a strong public policy, supported by concepts of fundamental fairness, in favor of trial on the merits, particularly when the monetary damages sought are substantial." *Swink v. City of Pagedale*, 810 F.2d 791, 793 n.2 (8th Cir. 1987) (citations omitted); *see also United Coin*, 705 F.2d at 846 ("Trials on the merits are favored in federal courts and a 'glaring abuse' of discretion is not required for reversal of a court's refusal to relieve a party of the harsh sanction of

default.") (citation omitted). Although the parties are not seeking monetary damages, a change in the priority of their liens will have a significant impact on each bank's ability to recover based on their interests in the Airpark Property. "Where a defendant appears and indicates a desire to contest an action, a court may exercise its discretion to refuse to enter default, in accordance with the policy of allowing cases to be tried on the merits. In the final analysis, default judgments are not favored in the law, and the entry of such a judgment is only appropriate where there has been a clear record of delay or contumacious conduct." *Wendt v. Pratt*, 154 F.R.D. 229, 230 (D. Minn. 1994) (internal quotation marks and citations omitted); *see also In re Jones Truck Lines, Inc.*, 63 F.3d 685, 688 (8th Cir. 1995) ("The entry of default judgment is not favored by the law and should be a rare judicial act.") (internal quotation marks and citations omitted).

In an abundance of caution to ensure careful consideration of Bushnell's motion, the Court will apply the factors usually considered when entry of default already occurred and a party seeks to vacate it: "(1) whether the opposing party would be prejudiced; (2) whether the proponent had a meritorious claim or defense; and (3) whether the proponent's culpable conduct led to the default." *Weiss v. St. Paul Fire & Marine Ins. Co.*, 283 F.3d 790, 794 (6th Cir. 2002) (citation omitted). With respect to the first factor, "delay alone is not a sufficient basis for establishing prejudice. Rather, it must be shown that delay will result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion." *INVST Fin. Grp., Inc. v. Chem-Nuclear Sys., Inc.*, 815 F.2d 391, 398 (6th Cir. 1987) (internal quotation marks and citations omitted). With respect to the second factor, "likelihood of success is not the measure. Rather, if any defense relied upon states a defense good at law, then a meritorious defense has been advanced." *United Coin*, 705 F.2d at 845 (internal quotation and editorial marks and citations

11

omitted).  With respect to the third factor, "[t]o be treated as culpable, the conduct of a defendant must display either an intent to thwart judicial proceedings or a reckless disregard for the effect of its conduct on those proceedings."  *Shepard Claims Serv., Inc. v. William Darrah & Assocs.*, 796 F.2d 190, 194 (6th Cir. 1986).

Here, several factors weigh in favor of accepting First Volunteer's late answer to the counterclaim.  Bushnell filed its counterclaim on November 23, 2020.  The deadline to answer the counterclaim passed by the time the parties appeared for their scheduling conference on January 14, 2021.  While Bushnell did not raise the issue of a missing answer or of possible default, First Volunteer willingly appeared and assisted in negotiating an accelerated pretrial schedule for this case.  Bushnell's delay in raising the issue, coupled with a pretrial schedule that ran only 60 days between initial disclosures and the close of discovery, suggests that Bushnell has not suffered any delay or prejudice from First Volunteer's late answer.  Bushnell never sought an entry of default under Federal Civil Rule 55(a), a prerequisite for default judgment.  *Cf. Clay v. Haga*, No. 1:20-CV-399, 2021 WL 707075, at *2 (W.D. Mich. Jan. 29, 2021) (default judgment on a counterclaim refused in part for failure to seek entry of default), *report and recommendation adopted*, No. 1:20-CV-399, 2021 WL 706327 (W.D. Mich. Feb. 23, 2021).  First Volunteer's participation throughout this case means that it has "otherwise defended" against Bushnell's counterclaim, thus weighing against entry of default.  *See* Fed. R. Civ. P. 55(a); *Bass v. Hoagland*, 172 F.2d 205, 210 (5th Cir. 1949) ("The words 'otherwise defend' refer to attacks on the service, or motions to dismiss, or for better particulars, and the like, which may prevent default without presently pleading to the merits."); *Liberty Mut. Ins. Co. v. Fleet Force, Inc.*, No. CV-09-S-773-NW, 2013 WL 3357167, at *7 (N.D. Ala. July 1, 2013) ("In short, an entry of default is permitted when a party fails to plead

(*e.g.*, by not answering) or file a responsive motion (*e.g.*, a motion to dismiss), but not when—as was the issue in *Bass*—the party fails to appear at trial."). The Court additionally infers a lack of culpable conduct from the nature of the claims and defenses on each side. Bushnell's counterclaim acknowledged the same core events asserted in First Volunteer's complaint. The issues in the counterclaim essentially are the inverse of the issues in the complaint: There are two liens recorded against the Airpark Property, and one lien or the other must have priority.[2] *Cf. Shepard Claims Serv., Inc. v. William Darrah & Assocs.*, 796 F.2d 190, 194 (6th Cir. 1986) (reversing the denial of a motion to set aside entry of default, where no prejudice occurred from tardiness and meritorious defenses were raised). With all sides having received ample notice of the central facts and issues in this adversary proceeding, First Volunteer's delay in answering the counterclaim was an oversight, as its counsel admitted at oral argument, and not a willful act or any act that caused prejudice.

---

[2] Incidentally, the inversion in the counterclaim of allegations from the complaint, plus the filing of First Volunteer's motion, are reasons why the Court distinguishes *In re Inman*, No. 05-73169, 2007 WL 781940, at *2 (Bankr. N.D. Ohio Mar. 12, 2007). In *Inman*, the plaintiff moved for entry of default, and the defendant merely opposed the motion and filed an untimely answer. The court applied Federal Civil Rule 55(a) strictly and directed entry of default, finding all the criteria met. The court then, however, gave the defendant leave to file a separate motion to set aside the entry of default under Federal Civil Rule 55(c) and to enlarge the time to answer *nunc pro tunc* under Federal Bankruptcy Rule 9006(b)(1). This Court might have been inclined to follow the approach of *Inman* had First Volunteer not filed its pending motion. First Volunteer's motion, though, effectively is the separate motion that had been authorized in *Inman*. Under these circumstances, requiring the Clerk's Office to file an entry of default and an order vacating it simultaneously would serve no practical purpose. Additionally, applying the *Inman* approach here would raise the awkward legal question of whether defaulting on a counterclaim that is the inversion of the complaint would go beyond establishing the counterclaim as unopposed and effectively nullify the complaint. The complaint and the counterclaim assert the same facts and interpret them differently. Under the complaint, which was properly filed, First Volunteer's lien would have priority. Unless defaulting on the counterclaim would somehow strike the complaint, First Volunteer would still have the right to litigate the assertions in its complaint, meaning that an entry of default on the counterclaim would have little practical significance. *Cf. Osnat Gad, Inc. v. Those Lead Underwriters of Int. at Naviga SA*, 359 F. Supp. 2d 316, 320 (S.D.N.Y. 2005) (denying the defendants' motion for judgment on the pleadings based on conflicting interpretations of insurance coverage, and then denying default judgment on the defendants' counterclaim for its interpretation of coverage, because "[t]he claims in the counterclaim are mere reciprocals of those in the complaint, and accordingly must be tried on their merits").

Finally, settling the priority of liens in this case requires reviewing a complex interaction of multiple state and federal statutes. No simple interpretation of the statutes immediately presents itself, and both sides have proposed interpretations that are reasonable and "good at law." First Volunteer's proposed interpretation, advanced both in the complaint and in the answer to the counterclaim, thus is "meritorious" for purposes of meeting the standard.

Bushnell's arguments do not change the above analysis. Bushnell relies on *Carrigan v. Arthur J. Gallagher Risk Mgmt. Servs., Inc.*, 870 F. Supp. 2d 542 (M.D. Tenn. 2012), for the proposition that First Volunteer "has admitted the truth of the allegations set forth in Bushnell's Counterclaim. This failure to respond places it automatically in default and that failure constitutes admissions to each Bushnell allegation in its Counterclaim that First Volunteer failed to deny." (Doc. No. 23 at 2.) This reliance is problematic for multiple reasons. As the Court has noted above, the parties agree on all the core facts of the case. The parties disagree only as to the legal significance of those facts, and as the Court noted in Footnote 2 *supra*, there are reasons to question whether a default on a counterclaim that is the exact inverse of a properly filed complaint would nullify the complaint and be dispositive of the entire case. The inversion of arguments is why reliance on *Carrigan* is misplaced. The complaint and the counterclaim in *Carrigan* were not inversions of each other; a default on the counterclaim for failure to make a payment under the sale agreement in question did not affect the claim in the complaint for breach of a non-compete clause in the same agreement. Additionally, the court in *Carrigan* noted that the defendant never sought entry of default but nonetheless concluded that "[h]aving failed to serve an answer, the plaintiff has effectively defaulted." 870 F. Supp. 2d at 555. That conclusion might have been true as a practical matter, and perhaps the court intended only a colloquial expression, but nothing in

14

*Carrigan* changed the rule that no default exists without an entry of default under Federal Civil Rule 55(a).  *See Burridge v. McFaul*, 181 F.3d 100, 1999 WL 266246, at *2 (6th Cir. 1999) (table case); *Lewis v. Detroit Pub. Sch.*, No. 12-11851, 2013 WL 5785777, at *2 (E.D. Mich. May 6, 2013) ("[E]ntry of a default under Fed. R. Civ. P. 55(a) is a prerequisite to entry of a default judgment under Fed. R. Civ. P. 55(b).") (citations omitted), *report and recommendation adopted*, No. 12-11851, 2013 WL 5785776 (E.D. Mich. Oct. 28, 2013).  Bushnell needed to seek an entry of default if, as implied in its arguments, it intended to win this entire case based on First Volunteer's failure to answer the counterclaim timely.  Even with an entry of default, the Court could reach a different legal conclusion based on the undisputed facts.  As for Bushnell's other arguments, the Court has shown above how First Volunteer, apart from the failure to file a timely answer to the counterclaim, appeared and participated in the case in all other respects.  Bushnell has not shown otherwise, and without that showing, any claim of prejudice resulting from a late answer sounds too much like an argument that Bushnell would be prejudiced simply because it would not prevail automatically.  *See United Coin*, 705 F.2d at 845 ("Mere delay in satisfying a [party's] claim, if it should succeed at trial, is not sufficient prejudice to require denial of a motion to set aside a default judgment.").

Under the circumstances, the Court does not need to take any action against First Volunteer's answer to the counterclaim.  First Volunteer should have filed its answer timely, but no prejudice resulted, and it appears to have participated fully in this adversary proceeding.  Accordingly, the Court accepts the answer to the counterclaim (Doc. No. 21) *nunc pro tunc*; denies Bushnell's motion to strike (Doc. No. 23); and grants First Volunteer's motion to preclude or to set aside entry of default (Doc. No. 25).

### E.  Summary Judgment

#### i.   Standard

The standard for summary judgment under Rule 56 is well known.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).  "Here, the parties have filed cross-motions for summary judgment.  Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law.  The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party or parties has satisfied the burden and should be granted summary judgment on the other motion."  *NetJets Large Aircraft, Inc. v. United States*, 80 F. Supp. 3d 743, 747 (S.D. Ohio 2015).  "When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party."  *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citation omitted).  In this case, the material facts are not in dispute.  What tolling statutes, if any, are applicable is vigorously disputed by the parties.

16

### ii.    Statutory Interpretation

Much of the analysis required for the pending motions relates to statutory interpretation, and a brief review of general principles is warranted.

> Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.  Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent.  The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.

*Robinson v. Shell Oil Co.*, 519 U.S. 337, 340–41 (1997) (internal quotation marks and citations omitted).  Only when a statute is ambiguous should courts consider legislative purpose and policy implications.  *In re Koenig Sporting Goods, Inc.*, 203 F.3d 986, 988–89 (6th Cir. 2000) (citations omitted).  "When two statutes seemingly address the matter in question, and one is special and particular and the other is general, then the general statute will be construed so as to operate on all the subjects introduced therein except the particular one which is the subject of the special provision."  *State v. Davis*, 173 S.W.3d 411, 415 (Tenn. 2005) (citation omitted).  Finally, "when two statutes conflict to some degree they should be read together to give effect to each if that can be done without damage to their sense and purpose."  *Muller v. Lujan*, 928 F.2d 207, 211 (6th Cir. 1991) (citations omitted).

### iii.    Section 28-2-111(a)

The parties agree that Bushnell's note secured by the 1998 Deed of Trust matured on March 7, 2008; and that, without consideration of any event that would toll that period, Bushnell had through March 7, 2018, to bring a suit to enforce its lien.  No foreclosure sale was completed, and no suit was instituted, prior to March 7, 2018.  If there is no tolling of that period, Bushnell's lien has been discharged.  Both sides reach this conclusion based on the language of Tenn. Code Ann.

§ 28-2-111(a).  That statute addresses the time period within which parties must commence an action to enforce liens on real property created by mortgages and deeds of trust.  Subsection (a) provides:

> Liens on realty, equitable or retained in favor of vendor on the face of the deed, also liens of mortgages, deeds of trust, and assignments of realty executed to secure debts, shall be barred, and the liens discharged, unless suits to enforce the same be brought within ten (10) years from the maturity of the debt.

Tenn. Code Ann. § 28-2-111(a).  The purpose of the statute is to quiet title.  *In re Payne*, 523 B.R. 560, 578 (Bankr. E.D. Tenn. 2014) (Parsons, *C.J.*) (citing *Fid. Mut. Life Ins. Co. v. Wall*, 68 S.W.2d 108, 110 (Tenn. 1934)).

The statute also provides, in subsection (c), the method to extend the enforceability of those liens or mortgages "without their priority or legal effectiveness being impaired, for any period of time agreed upon and beyond the ten-year period from the maturity of the obligation or debt, as provided for in subsection (a)."  Tenn. Code Ann. § 28-2-111(c).  That method requires a written instrument evidencing the agreement to extend the lien, which has duly executed and acknowledged and recorded prior to the date that is ten years from the maturity of the obligation or debt.  When that document is recorded, it serves as constructive notice to all persons, as provided by the registration laws of Tennessee.  Bushnell did not avail itself of this procedure to extend its lien.  Bushnell further clarified at oral argument that it does not consider the reaffirmation agreement in the First Mixson Case to be any kind of extension of the 1998 Deed of Trust that might have satisfied Section 28-2-111(c).  *Cf. In re Payne*, 523 B.R. at 580 ("And even assuming that Tenn. Code Ann. § 28-2-111(c) required the Bank to record an instrument to extend the deed of trust as to the Debtors, the court is satisfied that the recorded Confirmation Order with the Modified Plan substantially meets with the statute's requirements.")

The legislature provided a very specific way to extend the limitations period in the statute but did not include a tolling provision in the statute itself.  Bushnell argues that there is another provision in Title 28 that would extend the period without the need to record any additional document.  In Chapter 1 (General Provisions) of Title 28 (Limitations of Actions), Section 109 provides that "[w]hen the commencement of an action is stayed by injunction, the time of the continuance of the injunction is not to be counted."  Tenn. Code Ann. § 28-1-109.  The stay imposed by Section 362 of the Bankruptcy Code is effectively an injunction that stops any act to collect a debt owed prepetition or to enforce any lien securing that debt.  Bushnell argues that the automatic stay can serve as the injunction contemplated in section 109 to stop the counting of the time to enforce the lien.

There are two Tennessee Court of Appeals cases that address Section 28-1-109 and that consider whether the bankruptcy stay can stop the counting of available time.  They reach different conclusions as to whether the automatic stay may be an injunction that will toll a limitations period.  Unfortunately, neither addressed the limitations periods for liens created by deeds of trust.

The first case was decided in 2005.  In *Rabbit v. Mills*, No. M2004-01103-COA-R3CV, 2005 WL 2012774 (Tenn. Ct. App. Aug. 22, 2005), the appellate court rejected the plaintiffs' argument that their petition to revive a judgment was timely because the ten-year period to enforce their judgment lien should have been tolled by the period the debtor was in bankruptcy.  The plaintiffs obtained a nondischargeable judgment on September 7, 1990 from their successful objection to the defendant's discharge of their debt based on embezzlement.  The judgment was recorded on May 12, 1993.  In September 1993, the Bankruptcy Court ordered the payment of the judgment in installments and stayed any other actions to collect.  In December 1994, the defendant

19

filed a second bankruptcy, which was dismissed. The dismissal was appealed and finally upheld

by the Sixth Circuit Court of Appeals in 1998. The plaintiffs resumed their collection efforts in

2004, but the defendant claimed that the 10-year limitations period to enforce the judgment had

run. On January 30, 2004, the plaintiffs filed a petition for a writ of *scire facias* to revive their

judgment. The trial court relied on Section 28-1-109 to find that the filing of the second bankruptcy

case had extended the statutory period provided in Tenn. Code Ann. § 28-3-110. The appellate

court disagreed. Although the appellate court was sympathetic with the equities of the plaintiffs'

case, it concluded that the limitations period set in Tenn. Code Ann. § 28-3-110 was not tolled by

either the bankruptcy stay or the bankruptcy court order staying collection actions. Relying on an

earlier Supreme Court case considering whether the bankruptcy stay suspended the running of the

enforcement period for judgment liens, the Court of Appeals held that

> First, the [trial] court's reliance on Mills' Chapter 13 bankruptcy automatic
> stay as a means to suspend the running of the statute of limitations is erroneous. A
> bankruptcy stay itself cannot suspend the running of the statute of limitations.
> *Weaver v. Hamrick,* 907 S.W.2d 385, 391 (Tenn.1995). A suspension of the statute
> of limitations during an automatic stay can only result from a federal or state statute
> expressly providing for a suspension. *Weaver,* 907 S.W.2d at 391.

2005 WL 2012774, at *3.

The appellate court also looked at the limitations period statute and found the statute to be

"devoid of any language providing for tolling." *Id.* at *4. It then quoted the Tennessee Supreme

Court's view that it should not "engraft on this statute a tolling period." *Id.* (quoting *Shepard v.

Lanier*, 241 S.W.2d 587, 592 (Tenn. 1951)).

The case on which the *Rabbit* court relied to reject Section 28-1-109 as a tolling provision

had been issued by the Tennessee Supreme Court approximately ten years earlier. *Weaver v.

Hamrick*, 907 S.W.2d 385, 391 (Tenn. 1995). The case involved whether the bankruptcy stay

tolled the limitation period in Tenn. Code Ann. § 25-5-105 for the enforcement of a judgment lien on real property. *Id.* at 390. The Tennessee Supreme Court noted that the legislature had provided for an extension of the time in the following section, Tenn. Code Ann. § 25-5-106. That section extended the enforcement period when an injunction or other adverse proceeding in a court prevented an execution sale. *Weaver*, 907 S.W.2d at 390 (discussing *In re Hardin*, 25 B.R. 703 (Bankr. W.D. Tenn. 1982)). In *Hardin*, the bankruptcy court had not specified which trigger found in Section 25-5-106 the bankruptcy filing was—whether it was an "injunction" or an "other adverse proceeding" in a court that prevented a sale; it simply concluded the bankruptcy filing tolled the limitations period from the date of filing to the date of the trustee's abandonment. *Hardin*, 25 B.R. at 706.

*Weaver* considered *Hardin*'s holding but seems to have concluded that *Hardin* had found the filing to be an "other adverse proceeding in court" that prevented a sale. It then proceeded to distinguish *Hardin* on the basis that Section 25-5-106 had been amended since the *Hardin* ruling had been issued. That legislative amendment deleted the reference to "other adverse proceeding in court." Therefore, the Tennessee Supreme Court concluded that the legislature had effectively "narrowed the situations in which the life of the lien may be extended." *Weaver*, 907 S.W.2d at 390. The *Weaver* court found that "[t]here is no provision under Section 25–5–106 or any other State statute for the suspension or extension of the judgment lien enforcement period when a bankruptcy proceeding has stayed action against property subject to the lien. The conclusion is that State law does not preserve the lien beyond its term even though enforcement is precluded by the Bankruptcy Code." *Id.* at 390–91.[3] Although Section 28-1-109 was in effect, it was never

---

[3] The time within which to enforce a judgment lien was extended from three to 10 years after *Weaver*. 2000 Tenn. Pub. Acts 725.

mentioned in the *Weaver* case as another "State statute for the suspension or extension of an . . . enforcement period." This Court can only speculate that the Tennessee Supreme Court did not find it relevant since its case dealt with Chapter 5 of Title 25 dealing with the duration of judgment liens rather than the limitations periods for commencement of actions contemplated by Title 28.

The holding in *Weaver* prompted the Tennessee Court of Appeals several months later to hold that Section 28-2-111(a) would continue to run during the pendency of a bankruptcy proceeding. *See West Pointe Properties v. Frye*, 934 S.W.2d 339, 341 (Tenn. Ct. App. 1996). The court looked only to the extension granted in 11 U.S.C. § 108(c) to determine whether the action to enforce the lien was timely. The Court of Appeals did not mention Section 28-1-109 in the opinion.

The second opinion discussing Section 28-1-109 was issued twelve years after *Rabbit*. Judge Clement, who had been on the *Rabbit* panel, delivered the opinion for the court in *McCullough v. Vaughn*, 538 S.W. 3d 501 (Tenn. Ct. App. 2017). The case involved the time period to commence a tort action arising from an automobile accident. The court in *McCullough* relied on *Weaver* to hold that the bankruptcy stay did not extend the limitations period. It repeated *Weaver*'s holding that, to find a basis for an extension, the plaintiffs "need[ed] the benefit of a 'federal or state law that mandates that the time period is suspended.'" *McCullough*, 538 S.W.3d at 507 (citing *Weaver*, 907 S.W.2d at 391). This time, the Court of Appeals did consider whether Section 28-1-109 could provide the state law that could suspend the running of the limitations period. The court noted a difference between the expiration of a limitations period—*i.e.*, the expiration date—and the counting of time under Section 28-1-109. "The statute [Section 28-1-109] expressly provides for the suspension of deadlines during the continuance of the injunction,

and the bankruptcy court's automatic stay enjoined not only the commencement of this state court action but the issuance of process against Defendant." *McCullough*, 538 S.W.3d at 507 (citation omitted).  The court in *McCullough* ultimately held that the plaintiffs had 202 extra days to commence their personal-injury lawsuit, representing a restoration of time lost between the filing of the bankruptcy petition and the granting of a motion for relief from the automatic stay.  *Id.*  The Court finds the reasoning in *McCullough* logical.  Other than the policy reasons of not engrafting tolling provisions on to the judgment lien limitations period recited in *Rabbit*, this Court is hard-pressed to reconcile the holding in *Rabbit* with the holding in *McCullough*.  However, when construing a statute whose purpose is to quiet title, and the statute provides a simple way to extend, restraint in applying a general tolling statute to such a statute seems appropriate, and this Court should hesitate to engraft a tolling provision on such a statute.

If the Court looks to Section 28-2-111, the only means to extend the period is by a recorded extension.  Limiting the extension to only those situations in which there is a recorded instrument extending the date promotes the policy of quieting title.  The Tennessee Supreme Court in *Weaver* indicated that another federal or state statute could be used to suspend the period.  It considered Section 25-5-106, before its amendment, which provided an extension of the time period stated in Section 25-5-105.  However, those two statutes were clearly related by their specific subject matter and were part of a long-recognized statutory scheme for executing on a judgment lien.  *See Lincoln Sav. Bank v. Ewing*, 80 Tenn. 598, 604 (1883).

First Volunteer argues that Tennessee law requires that the tolling language must be in the statute itself.  (Doc. 15 at 19–20).  The Court does not find that to be the case.  *Weaver* looked to Section 25-1-106 for the extension of the limitations period in Section 25-1-105.  *McCullough*

looked to Section 28-1-109 for the tolling of the limitations period for filing a tort action. While this Court does not agree that a tolling provision must be found in the same statute as the limitations period, it does find that Tennessee courts require the tolling statute to relate expressly to the limitations period for lien enforcement. For these reasons, the Court finds *McCullough* distinguishable and will not apply Section 28-1-109 to toll the 10-year limitations period found in Tenn. Code Ann. § 28-2-111.

This Court's conclusion is supported by other federal courts' interpretation of *Weaver*. In *Bank of America v. Hall*, No. 3:14-CV-157-PLR-CCS, 2015 WL 7776559 (E.D. Tenn. Dec. 2, 2015), the District Court found that the bankruptcy stay did not toll the limitations period in Section 28-2-111(a), relying on the *Weaver* court's insistence that the operative statute or another statute expressly provide for an extension before the court would allow the mere filing of a bankruptcy to toll a statute of limitations. The District Court found that Tenn. Code Ann. § 28-2-111 did not contain a provision tolling the limitations period for enforcing the deed of trust. *Id.* at *3. This Court notes that the District Court did not have the benefit of the analysis in the *McCullough* case, issued approximately two years later, in which the Tennessee Court of Appeals looked to the general provision of Title 28 to find "another State statute" that provided that the period of the duration of the bankruptcy stay not be counted *See also In re Shippy*, No. 314–09865, 2016 WL 1178351 (Bankr. M.D. Tenn. Mar. 23, 2016) (similar analysis decided before *McCullough*); *Cherokee Millwright, Inc. v. Liberty Fibers Corp. (In re Liberty Fibers Corp.)*, No. 07–5043, 2008 WL 2368206 (Bankr. E.D. Tenn. June 6, 2008) (Parsons, *J.*).

First Volunteer also argues that Section 28-1-109 only tolls a limitations period when the injunction stops a civil action. First Volunteer argues that the nonjudicial process does not create

claims that are adjudicated through civil actions and that, therefore, Section 28-1-109 cannot be used to extend the time available for non-judicial foreclosure. *Cf. Threadgill v. Wells Fargo Bank, N.A.*, No. E201602339COAR3CV, 2017 WL 3268957, at *3 (Tenn. Ct. App. Aug. 1, 2017) (holding that a non-judicial foreclosure is not a compulsory counterclaim under state civil procedure rules). The Court is not persuaded that use of the term "action" is the reason why courts considering Section 28-1-109, as a basis for suspension of the lien enforcement statute of limitations, rejected it. Under Tennessee law, foreclosure can occur using judicial or nonjudicial process. *See* Tenn. Code Ann. §§ 35-5-101 to 35-5-118; *see also* Tenn. Code Ann. § 21-1-803 (authorizing judicial foreclosure sales). The availability of nonjudicial foreclosure is irrelevant. The availability of judicial foreclosure is the key consideration for the limitations period. It is the bringing of an enforcement action that prevents the discharge of the lien under Section 28-2-111(a). The Court recognizes that the use of judicial foreclosure is rare. "The almost exclusive means of foreclosure in the State of Tennessee has been nonjudicial, as outlined in Tennessee Code Annotated §§ 35–5–101 *et. seq*. Nevertheless, judicial foreclosures in Tennessee, although rarely invoked due to the ease of private sale under Tennessee deeds of trust, are authorized." *Dickerson v. Regions Bank*, No. M2012-01415-COA-R3CV, 2014 WL 1118076, at *8 (Tenn. Ct. App. Mar. 19, 2014) (citations omitted). One treatise notes that one reason for choosing a judicial foreclosure would be to toll the statute of limitations. "The mere posting of a notice of foreclosure is not a 'suit . . . brought' within the meaning of [Section 28-2-111(a)] unless the sale is completed before the end of the time." Hon. William H. Brown and Lawrence R. Ahern III, 16 Tennessee Practice Series, Debtor-Creditor Law and Practice § 5:17 (3d ed. and Dec. 2020 Supp.) (citing *Peoples Bank & Tr. Co. v. Chumbley*, 129 S.W.2d 213 (Tenn. 1939)). Limiting Section 28-1-109's tolling

to causes of action is not dispositive of whether it applies to extend the limitations period in this

case.

### iv.    Section 66-21-110

Having found that Tenn. Code Ann. § 28-1-109 does not apply in this case, there is one

additional statute to consider that arguably provides the basis for the suspension or extension of

the limitations period.  In 2006, the legislature enacted Tenn. Code Ann. § 66-21-110.  It

provides:

> Notwithstanding any other law to the contrary, if due to the filing of a bankruptcy petition under title 11 of the United States Code (11 U.S.C.), a creditor is stayed from filing the necessary documents to create or enforce a lien or security interest against the debtor's property, then any statute of limitations created or established by law for the perfection or enforcement of a lien or security interest shall be tolled until ninety (90) days after any of the following actions occur with respect to the filing of the bankruptcy petition:
>
> (1) The stay is lifted as to the creditor;
>
> (2) The case is discharged; or
>
> (3) The case is dismissed.

*Id.*  First Volunteer argues that, in a conflict between Sections 66-21-110 and 28-1-109, the former

supersedes the latter because both statutes address the same subject, and the former statute is the

more specific of the two.  *See, e.g., Five Star Exp., Inc. v. Davis*, 866 S.W.2d 944, 946 (Tenn.

1993) ("[A] general statute concerning a subject must defer to a more specific statute concerning

the same subject.").  The Court finds that Section 66-21-110 is a much more specific statute.  It

addresses the impact of a bankruptcy filing on a creditor's ability to file the necessary documents

to enforce a lien.  In this case, the necessary document would be a complaint to pursue a judicial

foreclosure.  The statute specifically calls for the tolling of any statute of limitations established

by law for the enforcement of a lien.  It provides the duration of the suspension of the statute of

26

limitations.  If the *Weaver* court were to look now for another state statute that addresses the tolling of limitations periods to enforce liens against property when a bankruptcy is filed, it would have to address Section 66-21-110.  The legislature appears to have enacted a specific tolling statute that would meet the criteria considered by the Court of Appeals when it analyzed the issue in 2005. *Rabbit*, 2005 WL 2012774, at *5.

The application of Section 66-1-110 has its own problems.  First Volunteer raises the issue of whether the statute is preempted by the Bankruptcy Code and therefore should not be considered. (*Compare* Doc. No. 15 at 33 ("Given that T.C.A. § 66-21-110 *also* conflicts irreconcilably with 11 U.S.C. § 108(c)(2) by extending the deadline by 90 days rather than by 30 days, it, therefore, is preempted for the same reasons T.C.A. § 28-1-109 is preempted.") *with* Doc. No. 30 at 15 ("[A]s there is clearly no express preemption in 11 U.S.C. § 108(c), this Court must find implied preemption or perhaps conflict preemption . . . . There is no conflict preemption because whether a deed of trust is still valid is wholly a creature of state law, and state law has determined that if a party has been enjoined from acting, and the automatic stay unquestionably acts as an injunction, the time in which the party is enjoined is added to the statute of limitations.").)  First Volunteer also does not want Section 66-21-110 applied because of the ambiguities in its terms.  (*See* Doc. No. 15 at 34 ("By providing that the 90-day grace period begins at the occurrence of 'any' of the specified three events, a case could have more than one different deadline or none at all.").)[4]

---

[4] Bushnell criticizes First Volunteer for taking contradictory positions on Section 66-21-110.  (*See* Doc. No. 30 at 16 ("Bushnell questions why First Volunteer devotes multiple pages of its brief to argue that Tenn. Code Ann. § 66-21-110 does not apply to this dispute while explicitly alleging in its Complaint that it *does* apply to this dispute.").  The Court does not necessarily see a contradiction.  The Court construes First Volunteer's arguments to mean that it prefers that Section 108(c) preempt all state statutes that the parties have cited; the argument about Section 66-21-110 being the more specific statute would be a fallback position.

Bushnell objects because it contends none of the events triggering the tolling has occurred.  (*See* Doc. No. 18 at 12).

The issue of preemption has been raised before, shortly after the statute's enactment. *Cherokee Millwright, Inc. v. Liberty Fibers Corp. (In re Liberty Fibers Corp.)*, No. 07–5043, 2008 WL 2368206 (Bankr. E.D. Tenn. June 6, 2008).  The court refused to apply the statute retroactively and did not find any other statute that suspended the limitations period.  Having found it did not apply, the court never reached the issue of preemption.

The Supremacy Clause of the United States Constitution vests Congress with the power to preempt state laws. U.S. Const., Art. VI, cl.2. The Sixth Circuit has recognized that bankruptcy is an area that the federal government has preempted but there is still substantial room for recognition of state law.

> [A] primary, underlying purpose of the Bankruptcy Code is to provide a uniform, nationwide system by which claims are handled.  As this Court has recognized, a mere browse through the complex, detailed, and comprehensive provisions of the lengthy Bankruptcy code, 11 U.S.C. § 101 *et seq.*, demonstrates Congress's intent to create a whole system under federal control which is designed to bring together and adjust all of the rights and duties of creditors and embarrassed debtors alike. While it is true that bankruptcy law makes reference to state law at many points, the adjustment of rights and duties within the bankruptcy process itself is uniquely and exclusively federal.  It is very unlikely that Congress intended to permit the superimposition of state remedies on the many activities that might be undertaken in the management of the bankruptcy process.

*In re Long*, 519 F.3d 288, 296–97 (6th Cir. 2008) (quoting *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 425 (6th Cir. 2000) (block formatting omitted)).  The Sixth Circuit summarized the categories of implied preemption earlier this year:

> State laws that interfere with or are contrary to federal law are invalid. Federal law may preempt state law expressly or implicitly . . . . Implied preemption has two types, field and conflict.  The former applies when federal law is so "pervasive" in one particular field that it exclusively occupies that field.  The latter

applies when federal and state laws conflict in a way that would make compliance with both impossible, or when the state laws interfere with the operation of the federal program.

*Torres v. Precision Indus., Inc.*, 995 F.3d 485, 491 (6th Cir. 2021) (internal quotation and editorial marks and citations omitted).  The Sixth Circuit in *Torres* later elaborated on the principles behind conflict preemption:

> There are two types of conflict preemption: impossibility and obstacle.  The first occurs when it is impossible to comply with both federal and state regulations.  The second occurs when the state law is an obstacle to the accomplishment and execution of the federal scheme.  In other words, if the state law would cause the federal law's operation to be frustrated and its provisions to be refused their natural effect, the state law must yield to the regulation of Congress.

*Id.* at 492 (internal quotation and editorial marks and citations omitted).

For example, when a creditor relied on a state court statute of limitations to be  an exception to the automatic stay, a bankruptcy court found that the area has been preempted and that such a position was contrary to the Bankruptcy Code.  *In re Lobherr*, 282 B.R. 912, 916 (Bankr. C.D. Cal. 2002) ("[T]he Bankruptcy Code has unequivocally set forth the manner and application of the automatic stay in a bankruptcy case.  Section 108(c) would have no meaning without the automatic stay.  To the extent that § 108(c) conflicts with the time period for renewing a judgment under California state law, § 108(c) preempts the California statutory scheme.").  In 2021, the California Court of Appeals examined the ruling in *Lobherr* and clarified that renewal of a judgment was not an action under California law that would have violated the stay.  It was merely a continuation of an existing right.  *Rubin v. Ross*, 279 Cal. Rptr. 3d 385, 390 (Cal. Ct. App. 2021) ("[D]ecisions of lower federal courts are not binding on us, even on questions of federal law . . . .  Upon consideration of the issues presented, we disagree with the bankruptcy court in *Lobherr* to the extent it concluded title 11 United States Code section 362 preempts and precludes a party from

seeking statutory renewal of a judgment under the Code of Civil Procedure, but we ultimately agree with its conclusion that title 11 United States Code section 108(c) extends the time within which a party has to seek renewal of a judgment.") (citations omitted).

In this case, the Court is hard-pressed to find express, field, conflict, or obstacle preemption. There is no express preemption or field preemption. Section 66-21-110 is a state tolling statute that directly relates to the duration of rights and property interests of mortgage holders and judgment creditors. The Bankruptcy Code expressly acknowledges that if states have statutes that suspend the running of a statute of limitations, it will honor those time periods in how it calculates its extension period. 11 U.S.C. § 108(c)(1). *See In re Bigelow*, 393 B.R. 667, 670 (B.A.P. 8th Cir. 2008) ("Section 108(c)(1) does not independently toll or suspend statutes of limitations which have not expired as of a bankruptcy petition date. The reference in § 108(c) to 'suspension' of time limits clearly does not operate in itself to stop the running of a statute of limitations; rather, this language merely incorporates suspensions of deadlines that are expressly provided in other federal or state statutes.") (citations omitted). The Bankruptcy Code expressly provides that the time period to bring the actions will be the later of the end of the period set by applicable nonbankruptcy law or 30 days after the termination or expiration of the stay. 11 U.S.C. § 108(c). The Tennessee statute extends the period to bring a lawsuit to enforce a lien for 90 days after the bankruptcy injunction has been dissolved or the case has been dismissed. It may result in Section 108(c)(2) never being applied in Tennessee, but it does not produce a conflict since the suspension of the limitations period would fall under Section 108(c)(1).

Section 66-21-110 is unlikely to be an obstacle to the bankruptcy process. It takes effect when either the property in question is no longer property of the estate because the stay has been

lifted as to the creditor holding the lien or the Court no longer has any jurisdiction because the case has been dismissed.  In many cases, the debt and the lien would be addressed in the case itself, through discharge of the personal obligation or through a sale of the property in question.  This statute appears to be the legislature's recognition that courts are not allowing the bankruptcy stay to be an injunction that tolls Section 28-1-111 and that 30 days is not enough time to resume litigation in this state.  The Court does not have to reach a final decision on whether the statute is pre-empted because even if it is applied, it does not solve Bushnell's problem with enforcement.

Having found that a specific statute exists and, for purposes of this case assuming that the statute is not preempted by federal bankruptcy law, the Court now applies its tolling provisions to this case.  Section 66-21-110 is not a model of clarity.  *In re Ball-thomas*, No. 08-12459, 2008 WL 2718907, at *3 (Bankr. E.D. Tenn. July 2, 2008) (Stinnett, *J.*) ("The statute is somewhat unclear. What are the necessary documents to create or enforce a lien?  The court concludes that the necessary documents include a complaint.  Is continuing a lien or its perfection necessary to enforce the lien?  Certainly that is true when filing before the deadline is needed to continue the existence of the lien, and that is the meaning of the Tennessee statute, § 66–11–106.").  Its terminology does not line up neatly with bankruptcy definitions.  For example, it uses the term "debtor's property," which is a term of art in bankruptcy, but the legislature did not clarify whether it intended to adopt the Bankruptcy Code's distinction between property of the debtor and the property of the estate.  Nonetheless, all the ambiguities in the statute do not need to be resolved under the particular facts of this case.  Between the end of the automatic stay and the order of discharge in the First Mixson Case, one of the qualifying events that would activate Section 66-21-110 happened here no later than November 12, 2019.  The combination of Mr. Mixson's

31

discharge and the abandonment of the Airpark Property terminated the automatic stay.  11 U.S.C.

§ 362(c)(1) and (2)(C).  For purposes of its analysis, the Court does not find the statute's use of

"lifted" as opposed to the Court's use of  "terminated" to be important.  Termination only clarifies

that the stay has been lifted for all creditors.  Both terms signify that the obstacle to enforcement has

been removed.  The tolling of Section 28-2-111 extended Bushnell's deadline from March 2018 to

February 10, 2020, 90 days after November 12, 2019.  Still, Bushnell did nothing to enforce its lien

under the deed of trust until October 2, 2020, and the action taken was not bringing a suit.

The other two events described in Section 66-21-110(2) and (3) that might provide a basis

for further tolling will never occur in this case.  First, a case is not something that is discharged under

the Bankruptcy Code.  *See* 11 U.S.C. § 727(a) (reserving discharge for "the debtor" and not a case).

Second, the First Mixson Case was fully administered and closed; at this point, it cannot be

dismissed.  The Court will leave how to calculate those time periods for the next court addressing

the statute when all the triggering events could occur and are relevant to that court's analysis.

The Court concludes that, even if Section 66-21-110 is applied and is not preempted by 11

U.S.C. § 108(c), the period tolled is not sufficient to extend the limitations period to a date beyond

the filing of the Main Case.  Bushnell ran out of time to bring an action to enforce its lien under

Section 28-2-111(a) in February of 2020.  Therefore, Bushnell's lien is discharged.

v.    *No Tolling of the Lien Against Ms. Mixson's Interest*

Because the Court has concluded that Bushnell's enforcement period has not been tolled

by Mr. Mixons' two bankruptcy filings and lien has been discharged, the Court does not need to

analyze whether Ms. Mixon's status as a joint tenant by the entirety with the debtor tolled the

enforcement of the lien against her interest.

*vi.*     *No Award of Fees and Expenses*

Bushnell also raised its entitlement to fees and costs in its motion for summary judgment. Because the Court has found Bushnell's lien to be unenforceable, it finds no legal basis for the assessment of fees and expenses. Therefore, Bushnell's request for fees is denied without prejudice to whether its fees and costs may be included in its claim against the debtor.

## IV.    CONCLUSION

Bushnell had 10 years to enforce the 1998 Deed of Trust. It did not extend its time period by recording an agreement to extend the maturity date as provided by Section 28-2-111(c). *McCullough* stands alone in its application that a bankruptcy injunction could serve to suspend the tolling of time to bring an action in a case, and that ruling involved a tort claim. In the area of lien enforcement and consensual property liens, Tennessee state courts and federal courts have rejected Section 28-1-109 as authority to toll the limitations period and found that the sole saving provision for a creditor facing expiration of the limitations period is 11 U.S.C. § 108(c). In 2006, the legislature enacted a new statute to address deadlines to take actions to enforce liens when they are stayed by the filing of a bankruptcy case, but that statute has been challenged as being unenforceable because of federal preemption. Nevertheless, the Court applied that statute to the facts in this case and has still concluded that Bushnell's period to enforce its lien expired prior to the filing of this case. Its lien is therefore discharged.

The Court will enter a separate declaratory judgement in which the Court denies Bushnell's motion for summary judgment (Doc. No. 17) and grants First Volunteer's motion for summary judgment (Doc. No. 15). The Court also will deny Bushnell's motion to strike (Doc. No. 23) and will grant First Volunteer's motion to preclude entry of default (Doc. No. 25).

# # #